(2 Misc. Rep. 523.)

## MASON v. WHEELER et al.

(Superior Court of New York City, Equity Term.  February, 1893.)

1. SALE—ACTION TO RESCIND—COMPLAINT.
   Where a purchaser of goods sues in equity to rescind the contract, and to compel the seller to refund the purchase money, on the ground of fraud, the complaint must show that plaintiff returned or tendered the goods purchased, or it must contain an offer to return them, in case he is not entitled to retain them.

2. SAME—FALSE REPRESENTATIONS—WHAT CONSTITUTE.
   Where a jobber of gold watch cases sells to a retail dealer a quantity of cases which are to be manufactured for the purchaser, and represents that they shall be a certain number of carats fine, and such cases are made of material of the requisite fineness according to the custom of the trade, and the seller receives only a fair price for the grade of cases delivered, he is not guilty of fraudulent representations because such cases, when assayed as a whole, with the solder necessarily used in their manufacture, are nearly a carat coarser than represented.

3. SAME—RETENTION OF GOODS.
   Where a jobber of watches sells a quantity of foreign watch movements, but instead delivers movements with the names of well-known domestic manufacturers stamped on each movement, and the purchaser retains such goods for several months until he sells nearly 10 per cent. thereof, he is not entitled to rescind the sale on the ground of fraud.

Action by John Mason against Hayden W. Wheeler and others to rescind a contract of sale of certain watch cases and movements, on the ground of fraud.  Judgment for defendants.

Franklin Bien, for plaintiff.
Harriman & Fessenden, for defendants.

GILDERSLEEVE, J.  In the summer of 1890, the plaintiff ·established himself in business, as a dealer in diamonds and jewelry, at No. 246 Fifth avenue, in the city of New York.  The defendants were engaged in business at No. 2 Maiden lane, in said city, as jobbers in watches, and had been so engaged for many years.  A business transaction was entered into by the plaintiff with the defendants, which consisted of the purchase by plaintiff from defendants of a quantity of watches, watch movements, and watch cases, aggregating in value the sum of $10,229.  The bulk of these

goods consisted of watch cases and movements, which the defendants, being jobbers, had had made by reputable manufacturers to fill the order received from plaintiff. The defendants had solicited the patronage of the plaintiff, and the plaintiff visited their place of business by appointment, and entered into the contract in question for the purchase of the goods which the defendants were to have manufactured as aforesaid. The plaintiff was a young man, who had served his term as an apprentice in the jewelry business, but who had had little or no experience as a merchant. From samples exhibited to him by the defendants, he selected the style of watch cases that he desired, stated the grade or quality of the gold of which he wished them to be manufactured, and, relying upon the experience and fairness of the defendants, left the price to be paid entirely in their discretion, and, to a large extent, the quantity of goods. Prior to the interview at which this contract was entered into, at defendants' place of business, the defendants, at plaintiff's request, purchased three chronometer watches, and one calendar watch, and delivered them to the plaintiff on memoranda, to be accepted by him, or returned within a limited time. These four watches were the best of the kind there could be obtained, were purchased from the sole importers of them, and invoiced to the plaintiff at the sum of $1,760, which was a reasonable and suitable price. They were not returned by the plaintiff, but the plaintiff paid the defendants therefor the sum charged in the invoice. Subsequently to the interview that resulted in the contract aforesaid, the defendants, at plaintiff's request, purchased a quantity of nonmagnetic watches from the Nonmagnetic Watch Company of America, the sole importers of the article, at the regular list price, with the discount off, and billed and delivered them to the plaintiff at the list price adopted by the Nonmagnetic Watch Company, which was the same price the plaintiff would have had to pay if he had bought them of the Nonmagnetic Watch Company himself. The price of these goods was $2,010, and it constitutes a portion of, and goes to make up, the aggregate sum of $10,229, above mentioned. From a careful consideration of all the evidence and circumstances, including the probabilities, it must be held that the transactions in respect to the chronometers, the calendar and nonmagnetic watches were not within the contract, but separate and distinct transactions. It is satisfactorily established by the evidence that these goods were purchased by the defendants for the plaintiff, at his request, duly delivered to the plaintiff, invoiced at reasonable and suitable prices, accepted and retained by the plaintiff, and paid for by him. The transactions were complete, and the evidence discloses no ground for complaint against the defendants on the part of the plaintiff. If these goods were not suited to the plaintiff's trade, and he was unable to find a market for them, the purchase of them by plaintiff was an error of judgment on his part, or a misfortune, for which no responsibility attaches to the defendants.

The plaintiff testifies that he paid the defendants $8,743. De-

ducting from this sum the bills for the chronometers and nonmagnetics, not included in the contract in question, amounting to $3,770, we find that the plaintiff paid the defendants $4,973 on account of the goods delivered under the contract in question, leaving an unpaid balance due from plaintiff to defendants, on account of the goods delivered under the contract, of $1,486 at the time this action was brought. The plaintiff testifies that the nonmagnetics were unsalable, and that he still has all of the chronometers, but that he did sell goods purchased from the defendants to the amount of $1,162. It must therefore be inferred that the plaintiff sold goods received under the contract to the amount of $1,162. At the commencement of this action, the plaintiff must therefore have had on hand, delivered under the contract, goods to the amount of $5,297. The plaintiff has paid the defendants, as already stated, $4,973 on account of these goods, and we must therefore, in order to ascertain the amount of money that the defendants should return to the plaintiff, deduct the $1,162 received for the goods sold, which leaves $3,811. The purpose of this action, therefore, is to compel the defendants to take back goods of the value of $5,297, and return to the plaintiff $3,811 in money. To accomplish this, the equity powers of the court are invoked to decree a rescission of the contract, and to direct the mutual acts of return and repayment to be performed. The demand is substantially that each may have his own of what remains in the possession of the respective parties.

At the opening of the trial, the learned counsel for the defendants contended, with much force and good argument, that the complaint shows a complete remedy at law in the nature of damages for breach of warranty; that the allegations of the complaint, if established, are not such as entitle the plaintiff to the interference of a court of equity; that a cause of action for a breach of warranty only is set forth; and that an inspection of the complaint fails to disclose an allegation of any special circumstance showing the inadequacy of the common-law remedy and a right to equitable relief. While this contention is not without grounds for its support, I am not inclined to accept it, but prefer to assume that the plaintiff's action has been properly brought. In Allerton v. Allerton, 50 N. Y. 70, the court of appeals say:

"The rule that he who seeks to rescind an agreement, on the ground of fraud, must place the other party in as good a situation as that in which he was when the agreement was made, is satisfied if the judgment asked for will accomplish that result, and in such a case no offer to return that which was received is necessary."

In Gould v. Bank, 86 N. Y. 84, in the opinion of the court, per Earl, J., it is said:

"The conclusion we thus reach leaves a defrauded party with ample remedies. One situated like the plaintiff can rescind by tendering or restoring what he has received, and then commence his action. He may keep what he has received, and sue to recover damages for the fraud; or he may commence an action in equity to rescind and for equitable relief, offering in his complaint to restore, in case he is not entitled to retain, what he has received.

These actions are all fundamentally different. If the party is not willing or able first to restore what he has received, he is confined to one of the last two remedies."

The plaintiff had availed himself of the advantages of the market during the "holiday season,"—the best portion of the year for his business,—and sold, presumably at good profit, about 10 per cent. of the goods delivered under the contract. He was not able to restore what he had received, and thereby put the defendants in the same position that they occupied when the transaction was completed. He does not allege an offer to return the goods; but, upon the trial, the plaintiff was allowed to put in evidence a letter from his attorney to the defendants, written before the commencement of this action, which contained an offer to return all the watches, amounting to upwards of $10,000 in value, "which were sold upon your representations and warranty." No opportunity seems to have been afforded to defendants to inspect the goods which the plaintiff desired to return. There was an offer by the plaintiff's counsel to tender the goods to the defendants in court, when a discussion arose, 'and the plaintiff's counsel concluded by saying: "I withdraw the tender. I make no tender at all, now." The goods, therefore, remaining in the plaintiff's possession, were not tendered at the trial, nor were they placed in the custody of the court. It must be held that, by the present action, the plaintiff has undertaken to avail himself of the latter of the last two remedies set forth in the opinion in Gould v. Bank, above quoted. The action is in equity to rescind the contract of purchase and sale. The prayer for relief is as follows:

"Wherefore plaintiff demands judgment—First, that the contract of purchase and sale, made under the false representations and warranty as aforesaid, be rescinded and declared null and void, and defendants be compelled to accept a return of said watches sold and delivered by defendants to plaintiff, under the false representations and warranty as aforesaid, and be compelled to pay to the plaintiff therefor the sum of $10,000, besides the costs and disbursements of this action; second, that, in default thereof, defendants be compelled to pay plaintiff his damages in the sum of $15,000, besides the costs and disbursements of this action."

It would seem, under the pleadings and proof, even from the plaintiff's standpoint, that the failure to return the goods, offer to return them, or put the court in possession of them, is an obstacle to the plaintiff's success. It may be stated as a general rule that a party who seeks to rescind a contract into which he has been induced to enter by fraud must restore to the other party whatever he has obtained by virtue of the contract. The reason for this rule is thus stated by Chief Justice Shaw in Thayer v. Turner, 8 Metc. (Mass.) 550:

"The plaintiff, as far as it is in his power, shall put the defendant in statu quo by restoring and revesting his former property in him, without putting him to an action to recover it before he can exercise his own right to take back the property sold or bring an action for it."

There are exceptions to this rule, but the present case is not within any of these exceptions. I think the complaint, under the authority of Gould v. Bank, supra, should have contained an offer

to restore.   If the present case is within any of the exceptions, it must be for the reason that the judgment asked for will place the defendants in as good a situation as that in which they were when the agreement was made.   The judgment here asked for, however, will not accomplish that.   In Allerton v. Allerton, supra, it was held that, where the judgment asked for will accomplish such a result, no offer to return that which was received is necessary.   The case at bar does not comply with this condition.   Without resting this decision, however, upon this ground, we will continue the discussion of the case by taking up the real merits of the controversy. The action is founded upon the allegation of fraud, which is charged in the complaint as follows:

"The said representations made by defendants to the plaintiff, with reference to the quality of said watches, were false and untrue at the time they were made, and were made with intent to cheat and defraud this plaintiff out of his money."

To entitle the plaintiff to succeed, the representations must be shown to have been made with a knowledge that they were false and untrue, and for the purpose of deceiving the plaintiff, and that they had that effect.   The burden is upon the plaintiff to establish the truth of the foregoing averment by a fair preponderance of evidence.   The foundation of established facts must be satisfactorily proven by competent and reliable testimony.   They must not be left in uncertainty.   Fraud cannot be presumed.   Pryor v. Foster, 130 N. Y. 171, 29 N. E. Rep. 123.   The law presumes that men, in their dealings with one another, are actuated by pure motives, and seek worthy ends by honorable means.   Shultz v. Hoagland, 85 N. Y. 464.   If the plaintiff has failed to establish the alleged fraud, he cannot maintain the action on the theory that a liability, founded on contract, is disclosed by the evidence.   People v. Dennison, 80 N. Y. 656, 84 N. Y. 272.

At the opening of the trial, the learned counsel for the plaintiff clearly defined his position by stating:

"It may be entered upon the record that the action is an action for the rescission of the contract, upon the allegations alleged in the complaint."

Moreover, his able brief opens with this statement:

"This is an action brought to rescind a certain contract, upon the ground of fraudulent statements and representations made by the defendants to the plaintiff to induce the plaintiff to enter into the contract, and upon which the plaintiff relied in making the same."

The representations in question were set forth in the fifth paragraph of the complaint as follows:

"That thereafter the defendants represented and warranted to the plaintiff herein that all the goods which the plaintiff might purchase of the defendants, consisting of watches, should be full 18 and 14 carats, respectively, and of the same grade and quality that were sold by Tiffany and other leading houses in the business, and at a reasonable price therefor, and that, if the plaintiff ordered 18-carat watches, he should receive full 18-carat watches, and, if he ordered 14-carat watches, he should receive from the defendants full 14-carat watches, those being the only two classes of watches that plaintiff could use in his business."

These allegations of the complaint, when closely scrutinized, seem to be nothing more than a promise on the part of the defendants to do something in the future. The watch cases were to be of styles indicated by the plaintiff, and the movements and the cases were to bear the plaintiff's name. The plaintiff knew the defendants were jobbers, not manufacturers, and that these goods must be ordered from other parties and manufactured before they could be delivered to the plaintiff. There seems to be an entire absence of any allegation of false representations as to any existing fact held out as an inducement to the plaintiff to enter into the contract. The plaintiff says he was told that the watches which he might purchase from defendants should be full 18 and 14 carats, respectively, and that they should be of the same grade and quality that were sold by Tiffany and other leading houses in the business, and that the price should be reasonable. This branch of the contract seems to be nothing more than a warranty as to the character and quality of the goods, even if we accept it as set forth in the complaint and as plaintiff claims it was made. At this stage of the discussion, we are impressed with the force of the claim of defendant's counsel that the complaint shows a complete remedy at law, in the nature of damages for a breach of warranty. Relying upon these representations and warranty, and believing them to be true, the plaintiff says he purchased the watches between the 1st day of August, 1890, and the 1st day day of February, 1891, and that, about the 1st day of February, he first discovered that the representations made by the defendants with reference to the quality of the watches were false and untrue, and that they were made with intent to cheat and defraud; that the watches which had been represented and warranted by defendants to the plaintiff to be of a grade of 18 and 14 carats, respectively, were not of such a grade; but that the watches which the defendants represented and warranted to be 18-carat watches were of a grade of less than 17 carats, or thereabouts, and that the watches which defendants represented and warranted to be 14-carat watches were of a grade of less than 13 carats, or thereabouts; and that, by reason thereof, the plaintiff has been unable to use or sell such watches. Of the gold watch cases in question that were assayed, but one was found to be under 17 carats. It may be stated as being established that the 18-carat cases assay something over 17 carats, and the 14-carat cases assay something more than 13 carats. The plaintiff says that the contract called for full 18 and 14 carats. The other respect in which the goods were not as represented is that they were not of the same grade and quality that were sold by Tiffany and other leading houses in the business. He makes no complaint about the prices charged. The movements were all of American manufacture, of the best grade dealt in by defendants and leading houses in the business. The plaintiff claims that it appears from the evidence that Tiffany & Co. do not deal in movements of American manufacture. At the time the contract was entered into at defendants' place of busi-

ness, there were present, representing the defendants, Pearsall, the salesman, and one Brown, who had been 13 years in the employ of the defendants. Brown took the plaintiff's order, and entered it duly in the books of the defendants, and invoiced the goods as they were delivered in accordance with the order as entered at the time the contract was made, the gold watch cases all being described, respectively, as 18 and 14 carats. The order from the plaintiff for watches, together with four chronometers, already bought for plaintiff, and entered in the order book of defendants at this time, amounted to about the sum of $7,500, with specifications, sizes, designs, and such details as were necessary and usual, and the defendants distributed among several reputable manufacturers orders to make up watch movements and cases, with which the order of plaintiff was filled. Among these manufacturers were Jeannot & Shiebler, Keller & Untermeyer, Robbins & Appleton, the agents of the Waltham Company, and the Courvoysier & Wilcox Company. All of the watch movements were purchased from the Waltham Company, with a few exceptions. The orders to the other concerns were mostly confined to watch cases. The defendants did not manufacture any of the goods in question, and in all instances they directed the watch cases to be 14 and 18 carats, respectively. All of the watch cases delivered by the defendants to the plaintiff under the contract were made of gold of the quality marked on each case, to wit, either 18 or 14 carats. The failure to assay full 18 and 14 carats after manufacture was due to the ordinary and usual process of construction. Solder is used in the construction, and, when the entire watch case is melted, this solder remains in the metal, and the assay of the case, therefore, shows a lower grade than the original gold plate from which the case is manufactured. It is due to this cause that the watch cases in question assay less than 18 and 14 carats, respectively. It appears further from undisputed testimony in this case that the gold manufactured into watch cases has a fixed and standard market price. A watch case made of 18-carat gold commands a price of 80 cents for each pennyweight of its actual avoirdupois weight. A gold watch case made of 14 carats commands a price of 64 cents for each pennyweight of its actual avoirdupois weight. A gold watch case of 19 carats commands a price of 85 cents for each pennyweight. In making up the price of a watch case, these factors are fixed. There is no deviation among manufacturers or jobbers, and for each particular watch case, in addition to the price per pennyweight, there is a charge for making, designing, and ornamenting, which varies according to the design, finish, or elegance of the ornamentation. The defendants in this case in all instances paid for the goods which they had had manufactured for plaintiff, and which they sold and delivered to him at the regular standard prices, for the articles. They charged the plaintiff the regular and ruling price for similar goods, and in no instance did defendants charge the plaintiff for any of the gold watch cases as much as the ruling price would have been if the case had

been made according to what the plaintiff claims was his formula for making full goods. It further appears by the undisputed testimony that the watch trade in the city of New York for many years has understood by the expressions 14 and 18 carat, as applied to watch cases, watch cases manufactured out of gold of 18 and 14 carat fineness, respectively; and it is universally known in the trade that in the manufacture of a case solder is necessarily used, and some parts are necessarily made of slightly inferior gold, for purposes of durability, and that the case, when assayed as a whole, according to the custom of the United States assay office, will assay less than 14 and 18 carats, respectively, but such cases are dealt in and regarded as 18 and 14 carats, respectively. This knowledge extends to makers, jobbers, and retailers, and many of the leading retailers, who cater to the best classes, consider such watches suitable to be sold by them as 14 and 18 carat watches.

The alleged false representations, as claimed by the plaintiff, that induced him to enter into the contract, were the statements by defendants, through their salesman Pearsall, that he (Pearsall) knew the class of watches and movements Tiffany & Co. carried. Plaintiff then disclaimed any personal knowledge of the business, but said he wanted the same class of watches that Tiffany & Co. carried, and that he wanted 18 and 14 carat full; and that, relying upon the defendants' knowledge of the character of Tiffany's goods, he gave the order, and believed when he received the goods that they were of the same grade, quality, and character as carried by Tiffany & Co. If it is established by the evidence that Pearsall at this time knew the grade and character of Tiffany's goods, and the defendants subsequently delivered to him (plaintiff) different and inferior goods, or if it appears from the evidence that Pearsall claimed to know the character of Tiffany's goods, when, as a matter of fact, he did not, it may be said that a false representation was made, for which the defendants were responsible, that operated as an inducement to the plaintiff to enter into the contract. Pearsall and Brown, defendants' employes, both swore positively that they were present when the plaintiff made the contract for the goods. The plaintiff, while he does not positively state that Brown was not present, says he had no conversation with Brown, but it all took place with Pearsall. An examination of all the evidence leaves no room for doubt that Brown was present and participated in the transaction. The plaintiff's testimony in support of his position is substantially as follows:

"Pearsall said defendants would sell me a grade of watches exactly of the grade that Tiffany and Company carried, which I particularly requested. * * * They should be the same as Tiffany and Company carried,—18 and 14 carats full. Pearsall said I could rely upon him for delivering such watches. * * * I purchased from defendants in pursuance of that arrangement. In making the payments, I relied upon their statements of the goods being perfect, and according to the goods Tiffany and Company sold."

When Pearsall was asked what the plaintiff, at the time of the transaction, said about Tiffany, he stated that plaintiff "said he

proposed to take a great deal of Tiffany's trade." He further testified that plaintiff said that he knew nothing whatever about watches or the watch business. Brown, for nine years in charge of defendants' watch department, testified that he was introduced by Pearsall to the plaintiff at the defendants' store; that, anticipating the arrival of the plaintiff, from information received from Pearsall, he had caused watch cases to be laid out for plaintiff's inspection; that the plaintiff indicated the style of cases he required, and said he wanted about one-half 18 carat and one-half 14 carat, stamped with his name and address; that plaintiff did not say he wanted watches equal to Tiffany & Co.'s, or that he wanted them full 18 and 14 carat. Brown testified that he was present during the entire conversation between plaintiff and Pearsall at this time, and that the only mention of Tiffany was made when plaintiff showed his card for the purpose of enabling Brown to get plaintiff's address, and upon the card were the words "Late with Tiffany." Brown further testified that the goods were ordered to be made for plaintiff from different manufacturers out of 18 and 14 carat gold. Wherever the testimony of plaintiff differs from the testimony of Brown, as to what occurred at the defendants' store, credit must be given Brown's statements. Brown's testimony upon the trial is corroborated by his entries in the order book made at the time, and he is also corroborated by Pearsall, and the subsequent acts of the defendants are entirely consistent with Brown's testimony.

On this question the price charged by the defendants for the goods is a strong reason for giving credit to Brown's testimony. It is conceded that the price was left entirely to the defendants. The prices charged were reasonable and suitable, and such as rule in the trade for regular 18 and 14 carat goods. Had the defendants procured the goods to be manufactured of a higher grade of gold, as they might easily have done, and produced a manufactured article that would assay 18 and 14 carat full, they were at liberty to charge the plaintiff a price that would adequately compensate them for that class of goods, and, so far as appears, the profit to them would have been quite as large. They reaped no advantage from delivering to the plaintiff a different class of goods from what the plaintiff insists he ordered. The testimony of Fessenden, in connection with all the facts and circumstances developed by the evidence, warrants the inference that the plaintiff had a motive in repudiating these goods. Although it is not alleged in the complaint, plaintiff claimed upon the trial that defendants had failed in their contract in not furnishing foreign, instead of domestic, movements. Each of the movements was stamped with the name of some well-known American manufacturer. The goods were delivered from time to time, between May, 1890, and the middle of January, 1891, and the bulk of them were delivered before the 1st of November, 1890. The name of the maker upon the movements was immediate notice to the plaintiff that they were not foreign; and the attempt at rescission by the plaintiff

on this ground, in February, 1891, after he had sold 10 per cent. of the goods, was not sufficiently prompt to meet the requirements of the law, and would fall for that reason alone.

Upon the whole case, I reach the conclusion that the defendants have been guilty of no false representations, and that the evidence fails to establish any fraud on the part of the defendants. The plaintiff's efforts to establish his claim against the defendants have failed to fulfill the fundamental conditions imposed upon him by law. I can find nothing in the transactions of the defendants herein that indicates anything but fair and honorable dealings on their part. Having determined, for the reasons above set forth, that the defendants are entitled to judgment, I do not discuss the question of ratification, upon which much might be said, nor some other questions upon which the briefs of the respective counsel are very full and able. Judgment must be entered for defendants, with costs.